ESTATE OF JOSEPH H. LAUDER, DECEASED, LEONARD A. LAUDER AND RONALD S. LAUDER, EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Lauder v. Commissioner
Docket No. 21525-87
United States Tax Court
T.C. Memo 1994-527; 1994 Tax Ct. Memo LEXIS 535; 68 T.C.M. (CCH) 985; October 19, 1994, Filed *535 Decision will be entered under Rule 155. For petitioner: Albert H. Turkus, Ira T. Wender, Bernard J. Long, Jr., and Corinne A. Antley. For respondent: John A. Guarnieri, David L. Click, and Clement Shugerman. HAMBLEN
HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Chief Judge: Respondent determined a deficiency of $ 42,702,597.67 in Federal estate tax due from the Estate of Joseph H. Lauder. The deficiency is largely attributable to respondent's determination that the fair market value of EJL Corporation common stock owned by Joseph H. Lauder on the date of his death substantially exceeded the value assigned to such stock on the estate's Federal estate tax return. Specifically, while the stock was valued at $ 29,050,800 ($ 4,300 per share) on the estate tax return, respondent determined that the fair market value of the stock was $ 89,517,000 ($ 13,250 per share) on the date of death. [1]
*536 The parties' dispute regarding the fair market value of the stock in question centers on the effect of a shareholder agreement executed by EJL Corporation and its shareholders prior to Joseph H. Lauder's death. The agreement in question restricts a shareholder (or his estate) from transferring EJL Corporation common stock to a third party by providing that, prior to such a transfer, a shareholder must first offer his or her stock to EJL Corporation (and then if necessary to the remaining shareholders) at a price based on adjusted book value. Following Joseph H. Lauder's death, his stock was offered to, and purchased by, EJL Corporation pursuant to the shareholder agreement. In Estate of Lauder v. Commissioner, T.C. Memo. 1990-530, we denied petitioner's motion for partial summary judgment that the formula price contained in the shareholder agreement should be treated as controlling with respect to the fair market value of Joseph H. Lauder's stock for purposes of the Federal estate tax. In a subsequent Memorandum Opinion, Estate of Lauder v. Commissioner, T.C. Memo. 1992-736, we concluded *537 that the shareholder agreement was primarily intended to serve as a device to allow the shareholders, including Joseph H. Lauder, to transfer EJL Corporation common stock to the natural objects of their bounty for less than an adequate and full consideration in money or money's worth. As a consequence, we held that the formula price at which EJL Corporation common stock would change hands under the shareholder agreement would not control for purposes of determining the fair market value of the stock owned by Joseph H. Lauder on the date of his death. See sec. 20.2031-2(h), Estate Tax Regs. [2] Accordingly, a further trial was held for the purpose of determining the fair market value of the stock. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations of facts *538 and attached exhibits are incorporated herein by this reference. In addition, all relevant findings of fact set forth in our prior Memorandum Opinions in this case are incorporated herein by this reference. Joseph H. Lauder (Joseph or decedent) died testate on January 16, 1983 (the valuation date). Decedent was survived by his wife, Estee Lauder (Estee), his two sons, Leonard A. Lauder (Leonard) and Ronald S. Lauder (Ronald), and several grandchildren. (References to the Lauders are to Estee, Joseph, Leonard, and Ronald, collectively.) Leonard and Ronald were appointed executors of the decedent's will by the Surrogate Court, New York County, New York, on March 14, 1983. I. EJL Corporation
A. Organization and Shareholder Agreement
EJL Corporation (EJL or the company) was organized as a Delaware corporation on December 14, 1976, to serve as a holding company for Estee Lauder, Inc. (including its subsidiaries) and Mentzer Holdings, Inc. [3] At all pertinent times, the Lauders held all of EJL's voting common stock. Other than 2,100 shares of nonvoting common stock that were contributed to the University of Pennsylvania in 1976 (and later redeemed by EJL in 1981), EJL's *539 nonvoting common stock has at all times been owned by the Lauders, either directly or as trustees for certain trusts established for the children of Leonard and Ronald. EJL preferred stock has been owned by the Lauders and various organizations, including schools, museums, a hospital, and the Lauder Foundation. On December 14, 1976, the Lauders and EJL executed a document entitled "EJL Shareholder Agreement" (the 1976 shareholder agreement). [4] The 1976 shareholder agreement states that EJL shall have the option to purchase EJL common stock from a shareholder in the event of a shareholder's death or termination of *540 employment with EJL, or a shareholder's expressed intention to transfer all or a portion of his or her EJL shares. The above-described option also applies in the event that EJL common stock is otherwise subject to transfer by operation of law. [5] *541 The agreement states that, should EJL decline to exercise its option to purchase such stock, the stock shall then be offered to the remaining shareholders. In the event the stock is not purchased by either EJL or its shareholders, the agreement states that the stock may be transferred to a nonshareholder only with EJL's consent. Further, the prospective shareholder must agree to be bound by the terms of the shareholder agreement. [6]
Article 6.1 of the agreement states that the purchase price of the stock shall be: the net per share book value of the Shares (excluding the par value of any issued and outstanding Preferred Stock of the Corporation and any value for intangible assets, such as goodwill, leases, technical know-how, patents, trademarks, formulae, contracts, unfilled orders, etc.) as determined on the last day of the fiscal year of the Corporation preceding such Notice Date as reflected in the audited annual statement of the Corporation for the fiscal year ended thereon.
In addition, the agreement states that the purchase price shall be reduced by the amount or value of all dividends paid on such stock subsequent to the date it is valued and prior to the closing for the sale and purchase of such stock. Pursuant to article 6.3 of the agreement, stock purchased *542 thereunder may be paid for in cash or by a 20-year debenture bearing interest equal to the average industrial bond yield for "Aa" rated bonds for the 3 months preceding the issuance of such debenture. Article 9 of the agreement states that the agreement shall terminate upon the execution of a written instrument to that effect by EJL and each shareholder then owning shares. B. Estee Lauder, Inc. (ELI)
ELI grew out of Estee's desire to create a line of high-quality cosmetic products to be priced at prestige levels and marketed exclusively to high-end specialty and department stores. In 1948, Saks Fifth Avenue became the first department store to offer ELI's products. At the time of decedent's death, ELI had expanded into four major operating divisions or subsidiaries: Estee Lauder U.S.A., Clinique Laboratories, Inc., Estee Lauder, International, and Prescriptives. (These entities are described in greater detail below.) ELI's financial results for the period 1978 to 1982 were relatively strong. [7] In particular, ELI's revenues increased at a compound annual rate of 18.1 percent during this period. However, revenue growth was slowing on a year-to-year basis, with an overall *543 decline from 24.1 percent in 1978 to 6.7 percent in 1982. While ELI's operating income and net income grew at compound annual rates of 15.4 percent and 14.9 percent, respectively, during this period, net income declined slightly from 1981 to 1982. 1. Estee Lauder, U.S.A. (EL)
From the early 1950s through the valuation date, EL had evolved from a perfume house to a well-rounded cosmetics house. As of 1982, EL's products were sold in approximately 2,700 separate locations or "doors". EL maintained three separate product lines: Fragrances, makeup, and skin-care treatment. EL initially relied heavily on sales of Youth Dew, a fragrance first introduced to the market in 1953. During the period 1978 to 1982, however, Youth Dew sales had only grown at a *544 compound annual rate of 3 percent. At the same time, Youth Dew sales as a percentage of EL's total fragrance sales declined from 47.3 percent to 36 percent. In an effort to reduce its reliance upon Youth Dew, EL introduced several new fragrances during the period 1968 through 1978, including "Estee" in 1968, "Azuree" in 1969, "Aliage" in 1972, "Private Collection" in 1973, and four fragrances, "White Linen", "Pavilion", "Celadon", and "Cinnabar" in 1978. The fragrances "White Linen" and "Cinnabar" were very successful, generating compound annual sales growth for the period 1978 to 1982 of 88.4 percent and 82.9 percent, respectively. Further, the two fragrances each accounted for nearly 15 percent of EL's total fragrance sales in 1982. The company did not intend to introduce any new fragrances during 1983 or 1984. EL also offered a full line of makeup products intended to: (1) Capitalize on the market generated by Youth Dew; (2) reduce in-house reliance on the more seasonal fragrance products; and (3) realize the higher gross profit margins attainable on makeup products relative to fragrance products. Sales of makeup products (in dollars) grew at a compound annual rate of 16 *545 percent from 1978 to 1982, while unit sales only grew at an average of 5.9 percent per year over the same period. The average unit price for the makeup product line increased nearly 10 percent per year from 1978 to 1982. In addition to fragrances and makeup, EL marketed successful treatment products such as "Age Controlling Cream" and "Night Repair" in recognition of market trends and the higher gross profit margins attainable on such products. Treatment products represented EL's fastest growing product line on both a dollar and unit sales basis during the period 1978 through 1982. In 1982, EL led all divisions, accounting for approximately 34.6 percent and 62.5 percent of ELI's revenues and operating income, respectively. However, EL's sales were growing at a slower rate than sales of Clinique Laboratories, Inc., and Estee Lauder, International. For the period 1978 to 1982, EL's revenues increased at a compound annual rate of 14 percent, while operating income grew at a compound annual rate of 19.1 percent. Operating profit margins remained in excess of 22 percent during this period, reaching 26.5 percent by 1982. 2. Clinique Laboratories, Inc. (Clinique)
The Clinique *546 product line was started in 1968 to provide a complete line of allergy-tested, fragrance-free cosmetics and treatment products. [8]Clinique products were very successful with women of all ages and particularly with younger women who wanted a natural look from their cosmetics. In contrast to EL, Clinique products were only being sold in 1,655 doors as of 1982. *547 When the Clinique line was first launched, Leonard shared the view with Carol Phillips, the head of the division, that $ 5 million would be a reasonable target for Clinique's sales to plateau. Contrary to initial expectations, Clinique experienced extraordinary success and evolved into ELI's fastest growing division. During the period 1978 to 1982, Clinique's revenues grew from $ 57.7 million to $ 139.2 million (compound annual growth of 24.6 percent) while operating income grew from $ 15.2 million to $ 45.3 million (compound annual growth of 31.4 percent). Clinique's operating profit margins increased from 26.3 percent in 1978 to 32.5 percent by 1982. During the period in question, Lancome, a subsidiary of Cosmair, posed a competitive threat to EJL, and particularly Clinique. In response, Clinique launched a successful, yet expensive, marketing program focusing on in-store events, mailers, and magazine advertisements. 3. Prescriptives
The Prescriptives line of products, consisting primarily of skin treatment and makeup products, was launched in the United States in late 1979 and in Italy, the United Kingdom, and Canada during 1981 and 1982. The Prescriptives line *548 of products was developed as part of the Lauders' continuing strategy to capture new market segments by launching a new line of products every 10 years. Prescriptives was targeted toward well-educated women ranging from 22 to 50 years of age who were entering or already in the job market. During the period in question, Prescriptives remained in a start-up phase with revenues growing from $ 2.2 million in 1980 to $ 5 million in 1982. At the same time, Prescriptives' operating income went from a deficit of $ 2.9 million in 1980 to a deficit of $ 3.1 million in 1982, typical of a division in a start-up mode. 4. International
The International division was launched in 1961 for the purpose of selling ELI's various products in foreign markets. [9] As of 1982, International was ELI's largest division with sales of $ 285 million in over 20 countries. For the period 1978 to 1982, International's revenues increased from $ 148.2 million to $ 284.5 million (compound annual growth of 17.7 percent) although revenues decreased from 1981 to 1982 by $ 4.3 million. During this period, International's operating income fluctuated from a high of $ 42.9 million in 1979 to a low of $ 32.3 million *549 in 1982. International's operating profit margins declined from 22.3 percent in 1978 to 11.4 percent in 1982. During the same period, International's net profit margins declined from 9.3 percent to 2.9 percent. International's lower operating and net profit margins reflected higher organizational and administrative costs associated with international operations as well as weak economic conditions in the international markets at the time. C. Distribution and Marketing
EJL's unique distribution and marketing strategies are described in detail in Estate of Lauder v. Commissioner, T.C. Memo. 1992-736, 64 TCM (CCH) 1643, 1646-1647, 62 TCM (RIA) 3716, 3719. During the period in question, EJL continued to distribute its products exclusively through *550 high-end specialty and department stores where the company was able to obtain beneficial selling terms and the best counter locations. Although EJL marketed its cosmetics as high quality products at prestige level prices, the company had also pioneered "gift with purchase" and "purchase with purchase" sales promotions, a form of discounting within the cosmetics industry. D. Management
Decedent was serving as executive chairman of the board and treasurer of EJL on the date of his death. There is no indication that decedent's death significantly impacted management at EJL. Estee was in her mid-to-late seventies as of the valuation date. Although Estee's duties as an active manager at EJL were declining, she nonetheless continued to serve as chairman of the company and played an important role in developing new products. Leonard was 49 years old as of the valuation date and was serving as president and director of EJL and president and chief executive officer of ELI, taking his mother's place as the day-to-day manager of the business. Ronald was 38 years old as of the valuation date and was serving as executive vice president and director of EJL and served as chairman of *551 the International division. Each of ELI's four main divisions was managed by an individual who was not a member of the Lauder family. Length of service among these managers ranged from 19 years for the president of EL to 3 years for the president of International. E. Dividend History
EJL's net income available to common shareholders grew from $ 19.1 million in 1978 to $ 33.4 million in 1982. EJL paid cash dividends to its common shareholders during the 5-year period preceding Joseph Lauder's death as follows: Fiscal Year Ending June 30
Cash Dividends
Payout Ratio [10]
1978
[11] $    524,000
2.74%
1979
1,117,000
4.40%
1980
11,171,000
36.04%
1981
7,599,000
22.31%
1982
7,220,000
21.63%
As of the valuation date, the Lauders had no immediate plans to reduce EJL's dividend. In addition to receiving dividends *552 from EJL, Leonard and Ronald (and their wives) received substantial dividends during the period in question from Aramis, Inc.[12]
F. Salaries and Bonuses
The following schedule lists total salaries and bonuses that EJL paid to the Lauders during the 5-year period preceding Joseph's death. Year
Estee
Joseph Leonard
Ronald 1978
$ 387,293
$ 387,293
$ 359,996
$ 131,151
1979
479,890
480,240
631,554
620,778
1980
530,690
530,690
697,808
686,024
1981
573,470
573,470
765,800
745,028
1982
614,600
614,600
830,000
809,420
In addition to salaries and bonuses, Estee received royalty payments from EJL in excess of $ 39 million during the period 1979 through 1982. During this period, Leonard's wife, Evelyn, earned salaries and bonuses increasing gradually from $ 131,151 in 1978 to $ 210,200 in 1982. G. Ownership
On January 16, 1983, EJL's *553 common stock was owned as follows: Owner
Voting
Nonvoting
Total
Estee
2,546
7,684
10,230
Joseph
760
5,996
6,756
Leonard
247
5,614
5,861
Ronald
247
5,614
5,861
Trusts for the
--
4,100
4,100
children of Leonard
and Ronald
Totals
3,800
29,008
32,808
Each share of EJL common stock, whether voting or nonvoting, holds the same economic interest in the equity of the company. EJL common stock has never been listed on a stock exchange or traded in any market. At no time, up to and including the date of decedent's death, did the Lauders have any intention of selling either ELI or EJL or of making a public offering of the stock of either company. Further, during this period, the Lauders intended that a third generation of their family would eventually own, manage, and control the family business. II. Decedent's Will
Joseph and Estee executed separate wills in 1963. Estee was not named as a beneficiary under Joseph's will. If EJL and the surviving shareholders declined to purchase decedent's EJL stock, the stock would have passed under his will to Leonard, Ronald, and the Estee and Joseph Lauder Foundation, Inc., subject to the approval of EJL under *554 the shareholder agreement. III. Economic Conditions
The year 1982 began with the U.S. economy remaining in recession. The economic climate was characterized by continuing high rates of interest and inflation, as well as declining industrial production, rising unemployment, a growing Federal budget deficit, and deteriorating corporate liquidity. Adverse economic conditions were also prevalent in most western European countries during 1982, including high rates of inflation and rising unemployment. During the early 1980s, a strong dollar hampered exports for U.S. manufacturers. However, by the end of 1982, most economists were predicting the near-term start of a recovery within the U.S. economy, although its actual timing was uncertain. Some economists were predicting the beginning of a recovery in the fourth quarter of 1982 and projected real growth in gross national product of 3.7 percent for 1983, with inflation at 5.5 percent. Factors underlying an economic turnaround included corporate cost cutting, rising productivity, declining interest rates and debt levels, an impending Federal tax cut, increased military spending, and a more accommodative Federal monetary policy. *555 IV. The Cosmetics Industry
A. General Economic Factors
In light of declining unit sales of cosmetics during the period stretching from 1980 through 1982, it was evident that the cosmetics industry was not "recession proof". While sales (in dollars) were increasing during this period, those increases were largely attributed to price increases. Further, profit margins for cosmetics were under pressure due to competition (increased advertising and promotional expenses), a strong dollar, and the effects of inflation. B. Competition
In 1982, EJL was one of only eight companies in the cosmetics and toiletries industry with sales exceeding $ 380 million. These eight companies accounted for approximately 40 percent of total industry sales through retail outlets in 1982. As of the valuation date, competition within the cosmetics industry was increasing as a consequence of several large, diversified companies' having entered the market during the 1970s. Specifically, Squibb acquired Lanvin-Charles of the Ritz, Eli Lilly acquired Elizabeth Arden, Pfizer purchased Coty, and Chesebrough-Ponds acquired Erno Laszlo. These companies brought large research and development *556 budgets and marketing expertise to the cosmetics industry. While EJL's financial resources were certainly more limited than its larger competitors, EJL, as a privately owned company, enjoyed advantages over these companies in terms of flexibility and lack of urgency to produce short-term profits. During the period in question, Revlon, one of EJL's strongest competitors, suffered declines in the department store distribution channel. Revlon's difficulties were attributable in large part to a managerial decision to devote increasing attention to mass market distribution channels. During the early 1980s, Revlon faced numerous challenges including a weakness in its core fragrances, insufficient promotional support for its various product lines, and strained relations with retailers (both mass market and department stores) resulting in declining counter space. While Revlon's position was declining, Lancome launched an effort to unseat EJL from its dominant position within the high-end specialty and department store distribution channel by aggressively spending on advertising and promotion, including imitating EJL's gift with purchase program. C. Product Trends
The fragrance *557 segment of the cosmetics market had experienced tremendous growth during the 1970s. This growth was attributable to several market trends which continued during the early 1980s, including: (1) The popularity of prestige and so-called designer fragrances; (2) growth in sales of fragrances for men; and (3) increased demand from women (particularly working women) who were using perfumes on a daily basis. By the early 1980s, cosmetics fashion was moving towards skin-care treatment products emphasizing a healthy, natural look. In order to compete in this market segment and satisfy more sophisticated consumers, cosmetics companies found it necessary to increase research and development and provide proof that products performed as advertised. While the trend toward treatment products presented unique challenges for the cosmetics industry, the rewards in terms of potential revenues were thought to be large. The makeup segment of the cosmetics market continued to be driven largely by fashion and the semiannual unveiling of each company's "new colors". During the early 1980s, strong competition existed in the high-end markets where designer companies began marketing makeup products to *558 complement their successful fragrance collections. D. Distribution
During the early 1980s, greater volumes of cosmetics, including relatively expensive makeup and treatment products, were being sold in drugstores, discount stores, and supermarkets. The trend towards mass market distribution channels developed largely as a result of two factors: (1) An increase in the number of working women and the resulting decrease in the amount of time available to such women for shopping; and (2) an increase in the number of both cosmetics manufacturers and retailers willing to sell excess inventories to discount stores. While some companies with a strong presence in the mass market distribution channel were able to increase their sales, the decision to focus on this segment of the market proved to be a double-edged sword for Revlon resulting in a contemporaneous decline in its high-end department store position. In this regard, industry analysts recognized that there might be rewards for those cosmetics companies positioned to promise exclusivity to department stores. V. Expert Evidence
The parties filed expert reports and presented expert testimony intended to assist the Court *559 in determining the fair market value of decedent's EJL stock on January 16, 1983. A. Petitioner's Experts
1. Lehman Brothers, Inc.
Petitioner retained Lehman Brothers, Inc. (Lehman Brothers), an investment banking firm, to provide its opinion regarding the fair market value of the EJL stock owned by the decedent on the date of his death. More specifically, petitioner requested that Lehman Brothers alternatively evaluate the stock on the assumption that the EJL shareholder agreement is relevant to the valuation exercise, and, then, without regard to the shareholder agreement. William A. Shutzer (Shutzer), a managing director at Lehman Brothers, participated in the evaluation of the EJL stock, assisted in the preparation of a report on the subject, and testified on petitioner's behalf at trial. Because there has never been a public market for EJL common stock, Lehman Brothers adopted a comparative market valuation approach in evaluating the stock. Lehman Brothers selected 10 public companies from the cosmetics and toiletries industry that it considered most comparable to EJL on the valuation date. Lehman Brothers then calculated relevant market valuation ratios for *560 these public companies to determine the ratios that it would apply to EJL's financial results to derive a figure representing the unrestricted public market value of EJL common stock. Lehman Brothers then determined a minimum discount reflecting the lack of a public market (lack of liquidity) inherent in the EJL stock. Lehman Brothers views the comparative market valuation methodology that it applied in this case as the most reliable and accurate means for determining the value of a company because it directly incorporates actual market data as of specific dates. Further, Lehman Brothers views the price to earnings ratio (the current market price per share divided by earnings per share) as the most reliable ratio to apply in carrying out a comparative analysis. [13] According to Lehman Brothers, the price to earnings ratio is the primary method used by leading investment banking firms and other investors to price securities and value companies. *561 Lehman Brothers selected the following publicly traded companies to compare with EJL: Avon Products (Avon); Chesebrough-Ponds (Ponds); Del Laboratories, Inc. (Del); Faberge Inc. (Faberge); Helene-Curtis Industries, Inc. (Helene Curtis); La Maur, Inc. (La Maur); Mary Kay Cosmetics, Inc. (Mary Kay); MEM Company, Inc. (MEM); Noxell Corporation (Noxell); and Revlon. Avon manufacturers and markets cosmetics, toiletries, jewelry, women's apparel, and household products primarily through direct sales (door-to-door and mail order). Although Lehman Brothers identified Avon as a much larger, more secure company than EJL, Avon was affected by certain negative demographic trends during the period in question including increasing numbers of working women and higher turnover rates among its sales force. While Avon's revenues, net income, and profit margins exceeded those of EJL, Lehman Brothers nonetheless concluded that EJL would command a higher price to earnings multiple than that of Avon given Avon's persistent pattern of declining net income. Avon was trading at a multiple of 10.6 on the valuation date. Ponds is a worldwide manufacturer and marketer of consumer products including cosmetics, *562 toiletries, packaged foods, hospital products, children's apparel, shoes, and tennis racquets. Lehman Brothers found Ponds to be a much larger and more diversified company than EJL. For the period 1978 to 1982, Ponds' sales and net income grew at compound annual rates of 13.7 percent and 15.8 percent, respectively. (Much like EJL, Ponds' year-to-year sales growth had declined from 21 percent in 1979 to 4.2 percent in 1982.) Lehman Brothers emphasized that Ponds' revenues were more than two times those of EJL and its net income was more than 3-1/2 times that of EJL. Further, its net income margins consistently exceeded those of EJL by 1 to 2 percentage points. Ponds' superior performance in these areas led Lehman Brothers to conclude that EJL would command a price-to-earnings multiple slightly lower than Ponds' multiple of 12.3 on the valuation date. Del markets cosmetics, toiletries, hair care products, and proprietary pharmaceuticals in the United States, Canada, England, and Ireland primarily through lower-end mass market distribution channels. Lehman Brothers viewed Del's product lines as lacking the national recognition afforded EJL's product lines. With the exception *563 of one fragrance product, Del's products were distributed through drug store and grocery chains and priced at the low-end of the market. Focusing on Del's lower sales relative to those of EJL, as well as Del's lower average operating and net income margins, Lehman Brothers concluded that EJL's price-to-earnings multiple would have exceeded Del's multiple of 9.4 on the valuation date. Faberge manufactures and markets fragrance products and cosmetics for men and women primarily though drug stores and low-end department stores. Lehman Brothers evaluated Faberge as a mid-sized company with inconsistent financial results over the period 1978 to 1982. Because Faberge's earnings in 1982 were lower than they had been 5 years earlier, Lehman Brothers believed that the high multiples accorded to Faberge primarily reflected analysts' expectations that its earnings would continue to rebound and begin to achieve margins commensurate to that of the industry in general. Lehman Brothers concluded that Faberge's 18.9 multiple did not reflect its future earnings power and would not be instructive in determining an appropriate value for EJL. Helene Curtis markets hair care and beauty aid products *564 through wholesalers, major department stores, drugstores, and supermarkets. Lehman Brothers compared Helene Curtis' financial results to those of Faberge; i.e., depressed earnings that analysts expected to rise to a more normalized level. Indeed, Helene Curtis had introduced several new products in 1981 and 1982 resulting in revenue growth of 18.6 percent for the 12 months ending in November 1982. Based on these considerations, Lehman Brothers concluded that Helene Curtis' price to earnings multiple of 24.8 would not be instructive in determining an appropriate multiple for EJL. La Maur manufactures and markets fashion-oriented hair products for both professional and retail (mass market) distribution. La Maur's sales and net income increased at compound annual rates of 22.1 percent and 70.2 percent, respectively, during the period 1978 to 1982. Notwithstanding these results, Lehman Brothers noted that La Maur's net income margin was lower than that of the industry in general. Lehman Brothers concluded that EJL would trade at a price to earnings multiple similar to La Maur's multiple of 12.0 on the valuation date. Mary Kay, like Avon, manufactures and distributes cosmetics *565 and toiletries for men and women through direct sales techniques. Lehman Brothers characterized Mary Kay's financial record as "extremely impressive" with sales and net income growing at compound annual rates of 54.3 percent and 56.3 percent, respectively, during the period 1978 to 1982. Mary Kay's impressive financial results reflected the cost advantages of direct sales to the consumer through saleswomen. Lehman Brothers concluded that analysts expected Mary Kay's sales and earnings to continue to grow at an extremely fast rate, and, therefore, Mary Kay's price to earnings multiple of 25.3 would be much higher than that of EJL on the valuation date. MEM manufactures and markets toiletries and cosmetics for men, women, and children primarily through low-end department stores and drugstores. While MEM's sales grew at a compound annual rate of 3.8 percent over the period 1978 to 1982, sales for 1982 had fallen 8.7 percent from 1981. During the period 1978 to 1982, MEM's net income declined at a compound annual rate of 5.7 percent. Given that MEM was a much smaller company and was growing at a slower pace than EJL, Lehman Brothers concluded that EJL would trade at a significant *566 premium to MEM's valuation date price to earnings multiple of 8.5. Noxell, like Faberge and EJL, is a mid-sized manufacturer of cosmetics and toiletries. Noxell had four well known product lines including "Noxzema" and "Cover Girl" which were distributed in the United States, Europe, and Japan through lower-end mass market outlets. Noxell's sales and net income increased at compound annual rates of 13.8 percent and 15.2 percent, respectively, for the period 1978 to 1982. Lehman Brothers focused on Noxell's consistently higher net income margins, its market position, and analysts' expectations that sales would increase with the end of the recession to support its conclusion that EJL would have traded below Noxell's price to earnings multiple of 14.3 on the valuation date. Revlon, marketing its products in approximately 130 countries, was the second largest company in the cosmetics and toiletries industry after Avon and the largest among companies using retail outlet distributors. Revlon's product lines included lower priced cosmetics, toiletries and beauty care products, prestige cosmetics lines, and health care products. Revlon's lower priced products were sold through drug *567 stores and supermarkets, while its prestige lines generally were sold through high-end specialty and department stores. While Revlon's sales grew at a compound annual rate of 12.4 percent for the period 1978 to 1982, its net income declined at a compound annual rate of 10.4 percent for the same period. Lehman Brothers believed that Revlon's decision to expand into mass market distribution channels had harmed its image and marred its relations in the high-end and specialty department store channel where EJL maintained a very strong presence. Given these concerns, Lehman Brothers concluded that EJL would have traded at a premium to Revlon's price to earnings multiple of 11.0 on the valuation date. Using the market valuation ratios of the comparable companies as a reference point, Lehman Brothers estimated a market ratio for EJL taking into account the state of the economy, the nature of the cosmetics industry, EJL's earnings, the prospects for future competition, and EJL's growth potential. In discussing EJL's future growth, Lehman Brothers suggested that EJL's sales would grow at a slower rate due to the Lauders' decision to continue to limit the distribution of EJL products through *568 high-end specialty and department stores. [14]
Based on the forgoing considerations, Lehman Brothers estimated that EJL would have traded at a multiple of 12.0 times its most recent earnings on the valuation date. Applying this multiple to earnings of $ 33.5 million, Lehman Brothers concluded that, if publicly traded, EJL common stock would sell for $ 12,253 per share. [15]
*569 Next, Lehman Brothers turned to the private market value of the stock, i.e., the reduced value of the stock (relative to public market value) after allowing for a discount to reflect the lack of liquidity or marketability of a minority interest in EJL. In addition to the lack of a public market for the stock, Lehman Brothers opined that a prospective investor would expect a discount in price reflecting: (1) The lack of a right to demand detailed financial information from EJL; [16] *570 (2) the Lauders' desire to maintain EJL as a privately held company; (3) the lack of a guarantee of steady dividend payments; and (4) EJL's complex corporate structure and the potential for conflicts of interest among the various entities owned by the Lauder family. [17] In any event, considering all of the previously described factors, Lehman Brothers concluded that a buyer would have required a minimum discount of 50 percent from the public market value of the EJL stock. Accordingly, in Lehman Brother's view, the fair market value of the stock in question was no more than a total of $ 41,394,012 or $ 6,127 per share as of January 16, 1983. In the alternative, Lehman Brothers evaluated the EJL stock assuming that the EJL shareholder agreement is relevant to the valuation exercise: (1) In its entirety; and (2) excluding the formula price provision. With respect to the former assumption, Lehman Brothers concluded that because a buyer of EJL stock would be subject to the rights of first refusal set forth in the agreement, no buyer would be willing to pay more than the adjusted book value of the stock. [18] In fact, Lehman Brothers opined that a buyer would pay less than adjusted book value for the stock recognizing that, should he ever decide to sell the *571 stock, he would likely be paid in the form of a below market 20-year note pursuant to article 6.3 of the shareholder agreement. Applying a discount of 12.85 percent to the adjusted book value of the stock, Lehman Brothers concluded that the restricted value of the EJL stock on January 16, 1983, was $ 24,206,748 or $ 3,583 per share. [19]
*572 Excluding the formula price provision from the analysis, Lehman Brothers concluded that a hypothetical buyer would expect a discount of at least 15 percent from the private market value of the stock to reflect the effect of the promissory note provision and the rights of first refusal under the shareholder agreement. Applying a 15-percent discount to Lehman Brothers' estimate of the private market value of the stock results in a value of $ 35,185,248 or $ 5,208 per share. Lehman Brothers also concluded that the "retention value" of the EJL stock (the value to an investor holding the common stock for an indefinite time for dividend payments and appreciation) was not sufficiently high so as to undermine either its comparative valuation or its analysis of the restricted value of the stock. 2. Stephens Group, Inc.
Petitioner retained Stephens Group, Inc. (Stephens Group), an investment banking firm, to provide its opinion regarding the fair market value of decedent's EJL stock as of the valuation date. Jon E. M. Jacoby (Jacoby), executive vice president and chief financial officer at Stephens Group, participated in the evaluation of the EJL stock, assisted in the preparation *573 of a report on the subject, and testified on petitioner's behalf at trial. Stephens Group invests in a wide variety of "special investments" for its own account. These special investments include positions in private companies (both controlling and minority positions), as well as investments in restricted securities of public companies. Stephens Group rarely undertakes assignments involving the sale of a minority interest in a private company due to a lack of investor interest in such transactions. Stephens Group endeavors to invest in firms that satisfy its "great company" philosophy: An industry leader with superior management, strong market opportunities, and potential for fast growth. However, any investment must meet strict pricing requirements. In particular, Stephens Group attempts to price an investment to produce a potential value of three to five times the purchase price within 3 to 5 years of making the investment. Such returns are consistent with those required by venture capital and leveraged buyout firms. In determining the price it will pay on an investment, Stephens Group evaluates a large number of factors that can be broadly grouped into three categories: *574 Investment position, voting control of the company, and means of obtaining a return on the investment. Stephens Group often tests its pricing determination against some of the more traditional valuation methodologies. After meeting with EJL's senior managers and reviewing EJL's financial results, Stephens Group determined that EJL satisfied its criteria for a "great company". Applying its criteria in evaluating the company, Stephens Group concluded that, as of the valuation date, it would have offered approximately 2 to 2-1/2 times decedent's share of EJL's most recent earnings or a total of $ 13.8 to $ 17.3 million for decedent's stock ($ 2,043 to $ 2,561 per share). At this price, Stephens Group believed that it could earn a return of approximately 25 to 70 percent taking into consideration both EJL's dividend policy and the "lottery ticket" value inherent in the investment should EJL be sold or its shares traded on a public market. Stephens Group concluded that the 1976 shareholder agreement would not affect the price that it would have been willing to pay for decedent's stock on the valuation date. Stephens Group attempted to verify its pricing determination by comparing *575 EJL with selected publicly traded companies. In particular, Stephens Group compared EJL with Avon, Faberge, Helene Curtis, Mary Kay, Noxell, and Revlon, eventually focusing on the latter two companies. Based on this comparison, Stephens Group concluded that EJL would have traded on a public market at approximately 12.8 times its most recent earnings or $ 88.3 million for decedent's shares. Stephens Group justified the 80 to 84 percent difference between the stock's hypothetical public market value ($ 88.3 million) and the price range that Stephens Group determined that it would pay for the stock ($ 13.8 to $ 17.3 million) by comparing the hypothetical EJL investment with 9 minority interest investments that Stephens Group made during the 10-year period 1983 to 1993. The 9 investments that Stephens Group used for purposes of comparison reflect "implied" discounts for lack of liquidity ranging from 35 to 84 percent. Stephens Group also evaluated the stock by applying a dividend discount analysis. Under this analysis, Stephens Group assumed a base dividend of $ 7.2 million (approximately 22 percent of EJL's earnings for 1982), an annual dividend growth rate of 10 percent, and a *576 25-percent discount factor reflecting the present value of future dividends. Based on these assumptions, Stephens Group determined a total implied equity value for EJL of $ 60.1 million of which $ 12.4 million is attributable to decedent's shares. 3. Dr. Colin C. Blaydon
Petitioner retained Dr. Colin C. Blaydon (Dr. Blaydon), Dean Emeritus and Professor of Business Administration at the Amos Tuck School of Business Administration at Dartmouth College, to provide his opinion regarding potential purchasers of decedent's minority interest in EJL, to describe their characteristics, and to isolate the investment criteria considered by them. Dr. Blaydon was also directed to attempt to develop an analytic framework for assessing the various ways and times at which an investor might expect to realize value from this investment and to determine the range of the discount that an investor would demand to reflect the lack of liquidity of the stock. Dr. Blaydon prepared a report on the above-described subjects and testified on petitioner's behalf at trial. Dr. Blaydon began his analysis by identifying the types of investors who might be interested in purchasing EJL stock including *577 pension funds, insurance companies, mutual funds, non-profit organizations, venture capitalists, leveraged-buyout firms, investment banks, and personal/individual investors. [20] According to Dr. Blaydon, an investor evaluating decedent's EJL stock would concentrate on the liquidity of the investment (including both the means for ending the investment and the time horizon for the investment), the degree to which the investor would be able to control EJL, and the anticipated return on the investment. *578 Focusing on the lack of a public market for EJL stock, decedent's minority interest in EJL, and the Lauders' desire to maintain control over the company, Dr. Blaydon concluded that the investment would have little appeal to the vast majority of potential investors. Dr. Blaydon concluded the most likely willing buyer of the decedent's stock would have been an individual investor. Next, Dr. Blaydon attempted to determine the price that a willing buyer would have paid for the EJL stock by analyzing the decision-making process that an individual investor would employ in evaluating the investment. Relying upon an analytic method known as "decision analysis", Dr. Blaydon prepared a decision-tree diagram which he used to assign probabilities to various uncertainties surrounding an investment in the EJL stock such as the means and timing for realizing a return on the investment and assessment of the value of the investment. In preparing the decision-tree diagram, Dr. Blaydon assumed that a willing buyer of decedent's stock: (1) Would require a return of 25 to 30 percent on the investment per annum; (2) could expect dividends equal to 1.7 percent of the market value of the shares; [21] *579 and (3) would expect the probability of a public offering of EJL stock to increase gradually from a probability of zero upon Estee's death, to 50 percent upon Leonard's death, to 75 percent upon Ronald's death, and to 100 percent upon the death of William Lauder, Estee's oldest grandchild. Depending on the assumptions employed, Dr. Blaydon concluded that a willing buyer would seek a discount ranging from 60 to 90 percent of the estimated value of the EJL stock if publicly traded. B. Respondent's Expert
Foley Mufson Howe & Co.
Respondent retained Foley Mufson Howe & Co. (Foley Mufson), an investment banking firm, to provide its opinion regarding the fair market value of decedent's EJL stock as of the valuation date. Michael J. Mufson (Mufson), managing director of Foley Mufson, participated in the evaluation *580 of decedent's EJL stock, assisted in the preparation of a report on the subject, and testified on respondent's behalf at trial. Like Lehman Brothers, Foley Mufson adopted a comparative market approach in evaluating decedent's EJL stock. In contrast to the specific methodology employed by Lehman Brothers, however, Foley Mufson evaluated EJL against a total of 13 comparable companies separated into two distinct peer groups. Peer group A, considered more comparable to EJL, consists of Avon, Del, Faberge, Mary Kay, MEM, Noxell, and Revlon. Peer group B, made up of companies having either a more diversified product line or a more narrow product line than EJL, consists of Alberto-Culver, Chesebrough-Ponds, Helene Curtis, La Maur, Inc., Neutrogena Corporation, and Redken Laboratories. In the portion of its report entitled "Preliminary Valuation Analysis", Foley Mufson determined a range of values for decedent's stock. First, Foley Mufson computed average multiples for both peer group A and peer groups A and B combined based on market capitalization (price per share) against revenue, operating profit, operating cash flow, and net income. The resulting average multiples were applied *581 to EJL's financial results to derive two sets of figures (based on the peer groupings) representing preliminary suggested market values for EJL common stock. The resulting figures were then weighted to arrive at final suggested market values derived from peer group A and peer groups A and B combined. [22] Specifically, Foley Mufson assigned a weight of 20 percent to the figures derived from revenues, operating profit, and operating cash flow, and a weight of 40 percent to the figure derived from net income to reflect the greater weight that the market assigns to earnings. This entire process was repeated using average multiples reflecting total enterprise value (equity market capitalization plus long-term debt and preferred stock minus cash and marketable securities) against revenue, operating profit, operating cash flow, and net income. Based on the foregoing, Foley Mufson computed suggested public market values per share ranging from a low of $ 15,602 per share to a high of $ 16,631 per share. *582 The Foley Mufson report includes analyses of the suggested value of EJL common stock based on initial public offering (IPO) and merger and acquisition (M&A) data. Foley Mufson derived suggested market values of $ 19,428 and $ 12,165 per share under its IPO and M&A analyses, respectively. The Foley Mufson report also includes a so-called pro forma analysis based on the theory that "When judging a [private] company's true value, adjustments are calculated to estimate the impact of 'artificial' expenditures." After making various adjustments to EJL's financial results, Foley Mufson repeated its peer group, IPO, and M&A analyses described above and arrived at suggested market values for EJL common stock ranging from a low of $ 14,108 per share to a high of $ 21,058 per share. This portion of the report was purportedly included for illustrative purposes only. The various figures described above are summarized in the portion of the Foley Mufson report titled "Valuation Conclusions". After allegedly eliminating the figures derived under its IPO, M&A, and pro forma adjustment analyses, Foley Mufson determined the relevant valuation range to be $ 15,500 to $ 17,500 per share, with a *583 midpoint of $ 16,500 per share. [23] However, assuming that EJL stock would trade above the average of its peers, Foley Mufson concluded that decedent's stock would trade on a public market at $ 18,150 per share. Next, Foley Mufson focused on the discount that an investor would demand to reflect the lack of a public market for EJL stock. Noting the Lauders' intention to maintain control over EJL, Foley Mufson concluded that the stock would trade at a discount of 40 percent from its public market value, resulting in fair market value for the stock of $ 10,890 per share. Foley Mufson did not take the EJL shareholder agreement into consideration in evaluating the fair market value of the stock. While the parties debate their significance, we note various misstatements contained *584 in the Foley Mufson report. First, Foley Mufson erroneously treated Estee Lauder A.G. (Switzerland) as part of the International division in analyzing divisional trends. Second, in arriving at its suggested aggregate valuation of EJL based on revenues, operating profits, and operating cash flow, Foley Mufson failed to account for the fact that EJL held only a 50 percent equity interest in Clinique. Third, Foley Mufson failed to consider certain expenses which normally would reduce operating profits, including royalty payments and foreign currency translation, in computing its suggested valuation for EJL based on operating profits and operating cash flow. Finally, while Mufson testified at trial that the pro forma adjustment analysis was included for illustrative purposes only, and that it did not affect his firm's final valuation conclusions, we are unable to discern from the report as submitted whether such adjustments were in fact eliminated from consideration. OPINION The Federal estate tax imposes a tax on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States. Sec. 2001; U.S. Trust Co. v. Helvering, 307 U.S. 57, 60 (1939). *585 The taxable estate is defined in section 2051 as the gross estate less deductions. The value of the Federal gross estate includes the value of all property to the extent of the interest therein of the decedent at the time of his death. Secs. 2031, 2033. It is well settled that fair market value is the accepted standard for determining the value of property subject to the Federal estate tax. United States v. Cartwright, 411 U.S. 546, 551 (1973). Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; see United States v. Cartwright, supra at 551; Gillespie v. United States, 23 F.3d 36, 40 (2d Cir. 1994). The determination of fair market value is a question of fact requiring the trier of fact to weigh all relevant evidence of value and to draw appropriate inferences. Helvering v. National Grocery Co., 304 U.S. 282, 294 (1938); Estate of Goodall v. Commissioner, 391 F.2d 775, 786 (8th Cir. 1968), *586 affg. on this issue T.C. Memo. 1965-154; Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). The central issue to be decided in this case is whether petitioner understated the value of decedent's EJL common stock on its Federal estate tax return. Contrary to respondent's determination, petitioner contends that decedent's EJL stock was overvalued on the estate tax return. Petitioner argues that the shares were worth no more than $ 17.3 million or approximately $ 2,561 per share on the date of decedent's death. However, if we conclude that the value of the stock was greater than that reported, petitioner contends that there nonetheless is no deficiency in Federal estate tax on the theory that, if a taxable transfer occurred, it occurred no later than December 14, 1976, the date the Lauders executed the EJL shareholder agreement. Should we reject this argument, petitioner further asserts that the estate is entitled to a marital deduction under section 2056(a) thereby reducing any resulting deficiency. I. Valuation
In cases where the property to be included in the gross estate is stock that is not listed *587 on an exchange and such stock cannot be valued with reference to bid and asked prices or historical sales prices, the value of listed stock of corporations engaged in the same or a similar line of business should be considered. Sec. 2031(b). The factors we must consider are those that an informed buyer and seller would take into account. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347. Such factors include, but are not limited to, the company's net worth, prospective earning power, dividend-earning capacity, goodwill, the economic outlook for the industry, its position in the industry, management, the degree of control represented by the block of stock to be valued, and nonoperating assets to the extent not otherwise considered. Sec. 20.2031-2(f), Estate Tax Regs. The divergent methodologies of the several experts that testified in this case reveal that the determination of the value of stock in a closely held company is a matter of judgment to be resolved on the basis of the entire record. Hamm v. Commissioner, supra at 939-940; Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989); *588 McShain V. Commissioner, 71 T.C. 998, 1004 (1979). Because such a valuation is necessarily an approximation, it is not required that the value we determine be one for which there is specific testimony, provided that it is within the range of figures which properly may be deduced from the evidence. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Hamm v. Commissioner, supra at 939-940. Given the imprecision inherent in the disposition of cases involving questions of fair market value (and the Solomon-like pronouncements that inevitably follow), we again remind the parties that such matters are best resolved outside of the confines of formal litigation. See Estate of Hall v. Commissioner, supra; Messing v. Commissioner, 48 T.C. 502, 512 (1967); see also Commissioner v. Marshall, 125 F.2d 943, 946 (2d Cir. 1942), revg. 43 B.T.A. 99 (2940). The opinion of an expert is admissible if it will assist the *589 trier of fact in determining a fact in issue. See Fed. R. Evid. 702. Although we evaluate expert opinion evidence based upon the qualifications of the experts and all other evidence relating to the value of the stock in question, Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970), we are not bound by any expert opinion that is contrary to our judgment. Helvering v. National Grocery Co., supra at 295; Silverman v. Commissioner, supra at 933. Before turning to the ultimate question of the fair market value of decedent's stock, we find it necessary to resolve two additional points of contention. First, petitioner argues that a decision should be entered in its favor on the ground that respondent failed to establish the amount of the deficiency. Second, the parties disagree whether the shareholder agreement is relevant to the valuation exercise at hand. A. Burden of Proof
In a footnote to petitioner's original brief, petitioner draws attention to the fact that respondent's expert arrived at a value of $ *590 10,890 per share for decedent's stock, a figure substantially below the $ 13,250 per share value that respondent originally assigned the stock in her deficiency notice. With this development apparently in mind, petitioner goes on to argue that petitioner has clearly satisfied its burden of showing that the deficiency is incorrect. Indeed, the government's evidence did not even purport to show that the asserted deficiency was correct. Since the government has totally failed to prove 'the correct amount of tax liability,' judgment should be entered for petitioner. * * *
Implicit in the preceding argument is the notion that a basis exists for imposing the burden of proof in this case on respondent. We disagree. It is well established that the Commissioner's deficiency determination generally carries with it a presumption of correctness and that the taxpayer bears the burden of proving that the determination is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Although respondent's expert arrived at a value for decedent's stock below that originally determined by respondent in the deficiency notice, such circumstances *591 do not, standing alone, require that the burden of proof shift to respondent. See Silverman v. Commissioner, supra at 930-931. Because petitioner failed to demonstrate that respondent's determination is otherwise arbitrary and excessive, see Helvering v. Taylor, 293 U.S. 507, 514-515 (1935); Berkery v. Commissioner, 91 T.C. 179, 186 (1988), affd. without published opinion 872 F.2d 411 (3d Cir. 1989), the deficiency notice is presumed correct, leaving petitioner with the ultimate burden of persuasion in this proceeding. Rule 142(a); Helvering v. Taylor, supra; Cebollero v. Commissioner, 967 F.2d 986, 990-992 (4th Cir. 1992), affg. T.C. Memo. 1990-618. It is on this basis that we will decide the instant case. B. Relevance of the Shareholder Agreement
Following decedent's death, his stock was offered to, and purchased by, EJL at a price based on adjusted book value consistent with the EJL shareholder agreement. In Estate of Lauder v. Commissioner, T.C. Memo. 1992-736, *592 we acknowledged that the agreement, on its face, served the bona fide business purpose of ensuring continued family management and control of the company. However, given that the parties to the agreement were all members of the same immediate family, we were obliged to subject the agreement to more exacting scrutiny. See, e.g., Muserlian v. Commissioner, 932 F.2d 109, 112 (2d Cir. 1991), affg. T.C. Memo. 1989-493. Considering all of the circumstances, particularly the arbitrary manner in which the formula price was selected, and the significant difference between the fair market value of the stock and the formula price, we concluded that the shareholder agreement was primarily intended to serve as a device to allow the shareholders, including decedent, to pass EJL stock to the natural objects of their bounty for less than an adequate and full consideration in money or money's worth. Sec. 20.2031-2(h), Estate Tax Regs. Consequently, we held that the formula price (the amount that EJL paid for decedent's stock) does not establish the fair market value of the stock for Federal estate tax purposes. We articulated our holding *593 as follows: While we do not here render the agreements invalid per se, we hold that for Federal estate tax purposes they have no viability and that the valuation provisions are, simply put, an artificial device to minimize such taxes.
Estate of Lauder v. Commissioner, T.C. Memo 1992-736, 64 TCM (CCH) 1643, 1661, 62 TCM (RIA) 3716, 3735. Prior to the trial of this matter, respondent filed two motions in limine seeking to preclude petitioner and its experts from taking the shareholder agreement into consideration in evaluating decedent's EJL stock. We denied respondent's motions in limine in favor of ruling on the relevance of the shareholder agreement following the trial of this matter. As previously discussed, Lehman Brothers performed alternative evaluations of decedent's stock depending on whether the shareholder agreement is considered relevant. Evaluating the stock on the assumption that the shareholder agreement is relevant, Lehman Brothers concluded that no buyer would be willing to pay more than the adjusted book value of the stock. Indeed, Lehman Brothers concluded that a buyer would pay less than *594 adjusted book value for the stock recognizing that, should he ever decide to sell the stock, he would likely be paid in the form of a below market 20-year note pursuant to article 6.3 of the shareholder agreement. Applying a 12.85-percent discount to the adjusted book value of the stock, Lehman Brothers concluded that the restricted value of the EJL stock on January 16, 1983, was $ 3,583 per share. In contrast, Stephens Group concluded that, because decedent's EJL stock was worth far less than adjusted book value, the shareholder agreement would not impact its evaluation of the stock. On the opposite end of the spectrum, respondent's expert, Foley Mufson, did not consider the shareholder agreement relevant to the valuation exercise. We agree with respondent that, in light of our holding in Estate of Lauder v. Commissioner, T.C. Memo. 1992-736, it would be anomalous if particular portions of the shareholder agreement are now deemed relevant to the question of the fair market value of decedent's stock. At the risk of belaboring the point, our responsibility is to determine the fair market value of decedent's stock on *595 the date of his death. In our prior opinion, we resolved that the formula price was intended to serve a testamentary purpose, and thus would not be respected for Federal estate tax purposes. It is worth noting at this point that we have not had the opportunity to address the validity of each and every aspect of the shareholder agreement. Nonetheless, we repeat the observation made earlier in these proceedings that there is no evidence in the record that the Lauders engaged in arm's-length negotiations with respect to any aspect of the shareholder agreement. Absent proof on the point, we presume that all aspects of the agreement, particularly those tending to depress the value of the stock, are tainted with the same testamentary objectives rendering the formula price invalid. [24]
*596 In light of our holding in Estate of Lauder v. Commissioner, T.C. Memo. 1992-736, we hold that the specific provisions of the shareholder agreement are not relevant to the question of the fair market value of decedent's stock on the valuation date. Simply put, the willing buyer/willing seller analysis that we undertake in this case would be distorted if elements of such testamentary origin are injected into the determination. Petitioner attempts to breathe new life into the shareholder agreement by pointing out that we declined to declare the agreement invalid per se in our most recent Memorandum Opinion. Petitioner's reliance on this aspect of our prior opinion is misplaced. Simply put, whether a particular shareholder agreement constitutes a binding contract between the parties to the agreement begs the purely legal question of whether the agreement, or any of its provisions, will be respected in determining the fair market value of the affected stock for purposes of the Federal estate tax. See, e.g., St. Louis County Bank v. United States, 674 F.2d 1207, 1210 (8th Cir. 1982). As indicated *597 above, we cannot agree that particular aspects of such an agreement can be employed to depress the fair market value of the subject stock (and thereby avoid Federal estate tax) where it is evident that the agreement was adopted primarily as a testamentary device. Further, it is on this basis that we distinguish Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989), the case relied upon by petitioner to support its contention that the shareholder agreement is relevant to the question of fair market value. This is not to say, however, that the existence of the 1976 shareholder agreement can be completely ignored or written out of the record. From our perspective, the shareholder agreement affirmatively demonstrates the Lauders' commitment to maintain family control over EJL. This element is properly accounted for below as a component of the discount applied to reflect the lack of a public market for EJL stock. C. Fair Market Value
With the foregoing as background, we move on to the question of the fair market value of decedent's EJL stock on the date of his death. Despite the diversity of the methodologies employed by the several experts *598 submitting reports in this case, we find that Lehman Brothers' comparative valuation approach, emphasizing the price/earnings ratios of comparable companies within the industry, provides the most objective and reliable basis for determining the fair market value of the stock in question. [25]
*599 We find that EJL's performance and future prospects compared favorably with Chesebrough-Ponds, and to a lesser extent with Noxell, during the period in question. In general terms, EJL, like most of its competitors, was suffering (in both its domestic and international markets) from the downturn in the economic cycle that began in 1980. Nonetheless, EJL continued to be active in both influencing and reacting to a dynamic market by releasing new products and product lines. Having taken steps to remain competitive, it is evident that EJL was as well positioned as any of its competitors to enjoy renewed growth as the economy emerged from recession. Contrary to the Lehman Brothers report, however, we once again decline to treat EJL's selective distribution strategy as a negative factor in our evaluation of the company. As noted in our most recent Memorandum Opinion, EJL's long-term success is largely attributable to the goodwill arising from the name "Estee Lauder", the Lauders' marketing acumen, and their uncanny sense of timing. Indeed, we find it ironic that, as of the valuation date, EJL appeared to be uniquely positioned to benefit from Revlon's decision to shift its focus *600 to the mass market distribution channels. At the time, Revlon faced numerous challenges including a weakness in its core fragrances, insufficient promotional support for its products, and failing relations with retailers (both mass market and department stores) resulting in dwindling counter space. [26] In contrast, EJL remained committed to the high-end specialty and department store distribution channel and stood to prosper from its ability to promise exclusivity to these retailers. In sum, while the movement towards mass market shopping for cosmetics was gaining momentum during the early 1980s, we are not persuaded that EJL's prospects for continued profitability and success were necessarily in jeopardy. *601 Based on the foregoing, we hold that EJL's operating performance and future earnings potential are best reflected in a price/earnings multiple of 12.2 as of the valuation date. Applying this multiple to EJL's earnings of $ 33.5 million for the period in question, decedent's stock, if publicly traded, would have sold for $ 12,457 per share as of January 16, 1983. Next, we must determine the proper discount to apply to account for the stock's lack of liquidity or marketability. Petitioner firmly established that the Lauders intended to maintain EJL as a privately held, family-controlled company. As of the valuation date, the likelihood that EJL's shares would be sold on a public market in the near term appeared remote. Nonetheless, we are not prepared to adopt the substantial discounts (ranging up to 90 percent) suggested by petitioner's experts. We cannot agree that such extreme discounts accurately reflect the fair market value of EJL stock. As we see it, the higher discounts recommended by petitioner's experts are better suited to investments that pose enormous financial risks and present no market, public or private, for liquidating the particular investment. [27] In light *602 of EJL's long-term financial success and its position as an industry leader, we do not view EJL as such an extreme risk. Considering all of the circumstances, and recognizing the Lauders' intention to maintain family control over the company, we conclude that a discount of 40 percent is appropriate to reflect the lack of liquidity of the stock. See, e.g., Estate of Hall v. Commissioner, supra at 326, 341, and cases cited therein. Accordingly, we hold that as of January 16, 1983, the fair market value of decedent's stock was $ 50,494,344 or $ 7,474 per share. II. Timing of Taxable Transfer
As a consequence of our holding that the fair market value of decedent's EJL stock was higher than that reported by petitioner on its Federal estate tax return, we find it necessary to address *603 petitioner's alternative argument that there nonetheless is no Federal estate tax deficiency on the theory that any taxable transfer in this case occurred on December 14, 1976 -- the date the Lauders executed the EJL shareholder agreement. Petitioner argues in pertinent part: For transfer tax purposes, the cognizable transfer with respect to any value in excess of the formula price was an irrevocable inter vivos transfer which occurred in 1976 when Decedent executed the Shareholder Agreement, agreeing that he would not transfer his Shares without first offering them at the formula price to the Company, and then to the other shareholders.
In reply, respondent asserts that petitioner's argument was not timely raised and that, in any event, the argument is inconsistent with the plain meaning of section 20.2031-2(h), Estate Tax Regs. In adopting the shareholder agreement, each of the Lauders mutually agreed, upon the occurrence of specified contingencies, to offer to sell his or her shares to EJL (and if necessary to the remaining shareholders) at the designated formula price. While such "options" might in some instances be viewed as a completed transfer of a valuable *604 property interest, see, e.g., Crane v. Commissioner, 368 F.2d 800, 801 (1st Cir. 1966), affg. 45 T.C. 397 (1966), we disagree with the proposition that the execution of the EJL shareholder agreement resulted in a completed irrevocable inter vivos transfer in this case. In particular, article 9 of the shareholder agreement states that the agreement can be terminated upon the execution of a written instrument to that effect by EJL and each shareholder owning shares at the time. Further, article 14 of the shareholder agreement states that the agreement may be amended by written agreement. Because the shareholder agreement was at all times subject to termination or amendment, we decline to treat the transaction as the equivalent of a completed irrevocable transfer. See Burnet v. Guggenheim, 288 U.S. 280, 286 (1933) (The gift tax is directed at "transfers * * * that have the quality of a gift, and a gift is not consummate until put beyond recall.") The record in this case amply demonstrates that the "options" granted pursuant to the shareholder agreement were not intended to be irrevocable *605 nor were they treated as such. In particular, the parties waived their rights under the shareholder agreement on December 15, 1976, so that EJL common stock could be transferred to trusts for the children of Leonard and Ronald and to the University of Pennsylvania. Furthermore, the shareholder agreement was amended on April 18, 1986, to state that the resignation of an employee, officer, or director of EJL required in connection with the acceptance of an elected government office or appointment to a position in public service would not be deemed to be a termination of employment under the shareholder agreement. This amendment was adopted to accommodate Ronald who was required to resign as an EJL director in order to serve as U.S. Ambassador to Austria. Absent this amendment to the shareholder agreement, Ronald would have been compelled to offer his stock to EJL and if necessary to the remaining shareholders. In sum, although neither the waivers nor the amendment of the shareholder agreement are objectionable in and of themselves, they do tend to refute petitioner's assertion that an irrevocable transfer occurred in 1976. Putting aside the waivers and the possibility of amending *606 the agreement, petitioner's argument must be rejected as contrary to section 20.2031-2(h), Estate Tax Regs. See Dorn v. United States, 828 F.2d 177 (3d Cir. 1987). We have considered the various authorities cited by petitioner and find them unpersuasive. Consequently, we hold that the value of decedent's gross estate includes the fair market value of the EJL stock that decedent owned on the date of his death. Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. III. Marital Deduction
We likewise must consider petitioner's second alternative contention that the estate is entitled to a marital deduction under section 2056(a). [28] *608 Petitioner argues that a marital deduction is warranted on the theory that decedent indirectly passed a valuable property interest to his wife, Estee, by virtue of the transfer of his stock to EJL at a price below fair market value. Estee owned 10,230 shares of EJL common stock on the date of decedent's death. Focusing on the enhanced value of Estee's stock following the transfer of decedent's stock to EJL, petitioner asserts that the estate is entitled to a marital deduction equal to 39.26 percent of $ 21,443,544 *607 -- the difference between $ 50,494,344 (the fair market value of decedent's stock as determined by this Court) and $ 29,050,800 (the value of the stock as reported on the estate tax return.) [29]
Petitioner is unable to cite any authority directly supporting its marital deduction argument. Rather, petitioner relies on Federal gift tax cases analyzing the impact of an inter vivos transfer of assets to a corporation for less than an adequate and full consideration. See Kincaid v. United States, 682 F.2d 1220 (5th Cir. 1982); Ketteman Trust v. Commissioner, 86 T.C. 91 (1986); see also sec. 25.2511-1(h), Gift Tax Regs; Rev. Rul. 71-443, 1971-2 C.B. 338 (where the Commissioner determined that a section 2523(a) gift tax marital deduction would be available under somewhat analogous circumstances). Citing the rule of statutory construction that the Federal estate and gift tax provisions are interpreted in pari materia, see Estate of Sanford v. Commissioner, 308 U.S. 39, 44 (1939), *609 petitioner concludes that an interest in property passed to Estee such that the estate is entitled to a marital deduction under section 2056(a).[30]
Respondent maintains that petitioner is attempting to extend the marital deduction provision beyond its intended scope. Respondent reasons that petitioner's argument should be denied on the theory that, because Estee will eventually be required to offer her stock to EJL at the formula price, any property interest purportedly passing to her is illusory. In conjunction with the foregoing, respondent concludes that the interest in question is a terminable interest under section 2056(b). Section 2056(a) provides that the taxable estate shall be determined by deducting from the value of the gross estate an amount equal to the value *610 of any interest in property which passes or has passed from the decedent to his surviving spouse, but only to the extent that such interest is included in determining the value of the gross estate and excepting any terminable interest as described in section 2056(b). While we recognize that the marital deduction is strictly construed, see Commissioner v. Estate of Bosch, 387 U.S. 456, 464 (1967), we nevertheless agree with petitioner that the estate is entitled to a marital deduction under the circumstances presented. To briefly recapitulate, we determined that the fair market value of decedent's EJL stock exceeded the value assigned to the stock by petitioner on its Federal estate tax return. Because the difference, $ 21,443,544, will be included in decedent's gross estate, it follows that the first element required for the deduction under section 2056(a) is satisfied. Additionally, we are persuaded by petitioner's argument that an interest in property passed (albeit indirectly) from decedent to his surviving spouse, Estee, as a result of the transfer of decedent's stock to EJL at the formula price. We first note that there is no requirement in *611 section 2056 that an interest must pass directly to the surviving spouse in order to qualify for the marital deduction. See sec. 2056(c); Harter v. Commissioner, 39 T.C. 511 (1962); Stephens et al., Federal Estate and Gift Taxation, para. 5.06[3][a], at 5-71 (6th ed. 1991). Further, we agree with petitioner that Federal gift tax cases such as Ketteman Trust v. Commissioner, supra, are sufficiently analogous to lend support to their argument that an interest in property passed to Estee and the remaining shareholders. Respondent has not convinced us otherwise. We likewise find it significant that respondent has permitted a marital deduction for purposes of the Federal gift tax under comparable circumstances. See Estate of Higgins v. Commissioner, T.C. Memo. 1991-47; Rev. Rul. 71-443, supra. Thus, we are left with respondent's argument that the estate should be denied the marital deduction on the ground that any property interest deemed to have passed to Estee constitutes a terminable interest under section 2056(b). Although Estee agreed *612 to offer her EJL stock to the company under the shareholder agreement, the fact remains that Estee generally will be subject to a Federal transfer tax should she or her estate transfer the stock for less than an adequate and full consideration. We cannot agree that such an interest is a terminable interest. In sum, we are convinced that the technical requirements of section 2056(a) are satisfied. We are also persuaded that allowing a marital deduction under the circumstances presented is compatible with the policies underlying the provision. To reflect the foregoing, Decision will be entered pursuant to Rule 155. Footnotes
1. The petition filed in this case includes an allegation that the correct value of the shares is $ 27,773,916 ($ 4,111 per share).↩
2. Unless otherwise indicated, section references are to sections of the Internal Revenue Code in effect as of the date of decedent's death, and Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Mentzer Holdings, Inc., was organized as a Delaware corporation on March 18, 1975, to serve as a holding company for the shares of Estee Lauder Cosmetics, Ltd. (U.K.), which markets cosmetics and fragrances in the United Kingdom. Prior to March 1975, Estee Lauder Cosmetics, Ltd. (U.K.), was owned by the Lauders and Estee Lauder, Inc. Mentzer was merged into Estee Lauder, Inc., on December 2, 1977.↩
4. The shareholder agreement adopted in 1976 served to supersede a similar shareholder agreement that the Lauders executed in 1974 as shareholders of Estee Lauder, Inc. In Estate of Lauder v. Commissioner, T.C. Memo. 1992-736↩, we held that both agreements were adopted primarily to achieve testamentary objectives.
5. If the number of shares offered to the company exceeds 50 percent of EJL's voting stock, then EJL is obligated under article 2.2 of the agreement to purchase all of the stock.↩
6. The shareholder agreement states that, in deciding whether to consent to a transfer to a nonshareholder, consideration should be given to the Lauders' intention to maintain EJL as a family business and to prevent stock transfers to a competitor.↩
7. ELI operated on a fiscal year ending June 30th. The figures discussed in this report generally are derived from ELI's audited financial statement for its fiscal year ending June 30, 1982, the most current financial data available as of the valuation date.↩
8. Clinique was organized as a separate company in 1973. As of the valuation date, ELI owned all of Clinique's class A common stock, which represented 80 percent of Clinique's voting stock. During this same period, Leonard and Ronald Lauder owned all of Clinique's class B common stock, which represented 20 percent of Clinique's voting stock. ELI was entitled to a preference as to Clinique's first $ 750,000 in earnings available for dividends as well as 50 percent of any earnings in excess of that amount. Leonard and Ronald were entitled to 50 percent of Clinique's earnings available for dividends in excess of $ 750,000. In sum, ELI's equity interest in Clinique was limited to approximately 50 percent.↩
9. EJL products were also sold in foreign markets through Estee Lauder A.G., which operated in Switzerland and sold fragrances on the duty-free market worldwide. Estee Lauder A.G. is not part of the EJL group.↩
10. The payout ratio reflects dividends paid over net income available to common shareholders.↩
11. This figure excludes a $ 12.2 million common stock dividend declared during 1978.↩
12. Aramis, Inc. was organized by the Lauders in 1965 to manufacture and market fragrances for men. Aramis, Inc. is not a part of the EJL group.↩
13. Shutzer rejected using certain other valuation ratios. In particular, he rejected the total-net-capitalization-to-net-revenue ratio on the ground that it fails to reflect a company's fundamental operating characteristics such as cost structures, margins, profitability risks, and industry trends. Although he recognized that the market-price-to-book-equity ratio produces a rough range of values for the net assets of a company, he declined to apply the ratio in appraising EJL because, at a specific moment in time, a company will nearly always be valued based on its expected earnings power. Finally, Shutzer asserted that the total-net-capitalization-to-operating-profit/cash-flow ratio should not be applied in appraising EJL because the ratio fails to take into account the cash flow needs of the particular company.↩
14. Lehman Brothers also viewed EJL's selective distribution strategy as a negative factor in its evaluation of the company for the period 1974 through 1976. Estate of Lauder v. Commissioner, T.C. Memo. 1992-736, 64 TCM (CCH) 1643, 1652, 62 TCM (RIA) 3716, 3725↩.
15. The $ 33.5 million figure utilized by Lehman Brothers for this computation is derived from EJL's audited financial statement for the fiscal year ending June 30, 1982, and reflects net income less dividends paid on EJL preferred stock for that year. Lehman Brothers viewed this financial statement as the best "proxy" for EJL's most recent results because neither EJL nor any of the comparable companies would have had time to compile financial results for the important 1982 Christmas season as of the Jan. 1983 valuation date.↩
16. Contrary to Lehman Brothers' understanding, Del. Code Ann. tit. 8, sec. 220↩ (1968 Cum. Supp.), provided that a purchaser of decedent's EJL stock generally would be entitled to inspect the company's books and records for a purpose reasonably related to such person's interest as a stockholder.
17. As a result of our review of the Lehman Brothers report and Shutzer's testimony on the point at trial, it appears that Lehman Brothers may have taken the potential for conflicts of interest among the Lauder companies into consideration twice in determining the value of decedent's stock. In particular, the matter is mentioned as a negative factor both in Lehman Brothers' analysis of the public market value of the stock, and in its analysis of the private market value of the stock.↩
18. After discussing the matter with petitioner's counsel, Lehman Brothers rejected the notion that a hypothetical buyer might pay a higher figure for decedent's stock with the hope of gaining voting control of EJL following Estee's death and the redemption of her shares at that time as mandated by the shareholder agreement. Lehman Brothers assumed that, if an outsider purchased decedent's stock, the Lauders would take the steps necessary to preclude that purchaser from later gaining control of the company.↩
19. Lehman Brothers opined that EJL and the Lauders would have had credit ratings of "Baa" and "Ba", respectively, as of the valuation date. Accordingly, Lehman Brothers concluded that an "Aa" rated debenture issued by either EJL or any one of the Lauders under article 6.3 of the shareholder agreement would be discounted 9.16 percent and 16.53 percent, respectively. The 12.85-percent discount used in Lehman Brother's computations represents an average of these two discounts.↩
20. Dr. Blaydon eliminated "strategic" investors from the pool of potential investors listed above. Dr. Blaydon's report states: "Strategic" (or "special circumstance") investors also comprise a category of potential investors. These include, for example, business competitors or other businesses with potential synergies with the target investment. I have eliminated from consideration such investors because their existence is quite speculative and their special interest would skew any analysis of the price a willing buyer would have paid for this stock.↩
21. Dr. Blaydon arrived at this percentage by dividing $ 7.4 million (average of dividends paid for 1981 and 1982) by $ 435 million (the fair market value of EJL derived from the notice of deficiency).↩
22. While the first set of ratios reflects the average of the seven companies in the first peer group, the second set of ratios reflects the average of the 13 companies included in both peer groups after eliminating the high and low ratio from each group.↩
23. Significantly, the $ 17,500 per share figure representing the high end of Foley Mufson's "relevant valuation range" exceeds by nearly $ 1,000 per share the highest suggested market value derived from Foley Mufson's preliminary valuation analysis.↩
24. We note with interest Lehman Brothers' conclusion that neither EJL nor the Lauders would qualify for the "Aa" credit rating used under article 6.3 of the shareholder agreement to set the interest rate to be paid on the 20-year debentures described therein. See supra note 19. While the Lauders certainly were free to adopt any rate of their choosing, the fact remains that the record is devoid of any evidence that the Lauders negotiated with respect to this aspect of the shareholder agreement. Shutzer testified that he did not inquire how the Lauders arrived at that credit rating. Given the state of the record, and consistent with our holdings in Estate of Lauder v. Commissioner↩, 1992-736, we will not permit petitioner to cite that aspect of the agreement as a factor depressing the value of decedent's stock.
25. Although we have given due consideration to the remaining reports, we have concluded that they are not entitled to the same weight we have afforded the Lehman Brothers report. Contrary to petitioner's position, we cannot agree that the report submitted by Stephens Group is the best evidence of the fair market value of decedent's stock. That report is largely a description of Stephens Group's methodology for evaluating a minority interest in a privately held company. Because the report lacks a wholly objective analysis of the willing buyer/willing seller standard, we do not find the report as compelling as petitioner suggests. Further, we are reluctant to rely on the Foley Mufson report given the previously described flaws in that report and the risk of distortion inherent in the generally formalistic methodology used by that firm.↩
26. From our perspective, some of the problems that Revlon was experiencing can be explained by Shutzer's testimony that the mass market outlets simply were not equipped to provide the promotional support needed to successfully market higher priced cosmetic products. Thus, the Lauders' reluctance to pursue this distribution channel is understandable.↩
27. We are not convinced that the market would engage in the rigid type of analysis that Dr. Blaydon followed in arriving at his estimate of the discount to applied to reflect lack of liquidity.↩
28. Sec. 2056(a) and (c) provides in pertinent part: (a) Allowance of Marital Deduction. -- For purposes of the tax imposed by section 2001, the value of the taxable estate shall, except as limited by subsection (b) [relating to terminable interests], be determined by deducting from the value of the gross estate an amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse, but only to the extent that such interest is included in determining the value of the gross estate. * * * (c) Definition. -- For purposes of this section, an interest in property shall be considered as passing from the decedent to any person if and only if -- (1) such interest is bequeathed or devised to such person by the decedent; (2) such interest is inherited by such person from the decedent; * * * (4) such interest has been transferred to such person by the decedent at any time;↩
29. The 39.26 percent figure that petitioner uses in this computation represents Estee's share of all outstanding EJL common stock (both voting and nonvoting) following decedent's death.↩
30. Petitioner also argues that a marital deduction is warranted to avoid the possibility of double taxation to the extent the amount in question will be included in both decedent's Federal gross estate and in Estee's gross estate upon her death.↩